**UNITED STATES of America, Appellee,**

v.

**Abraham SRULOWITZ,
Defendant-Appellant.**

**No. 131, Docket 85–1148.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 21, 1985.

Decided March 6, 1986.

which would at least postpone the imposition of any penalty for nonpayment. *See* 18 U.S.C.

Peter A. Norling, Asst. U.S. Atty. for the E.D. of N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty. for the E.D. of N.Y., Allyne R. Ross, Jane Simkin Smith, Asst.

§ 3565(c)(2) (penalties accrue only when fines are past due).

U.S. Attys., Brooklyn, N.Y., on brief), for appellee.

Alan M. Dershowitz, Cambridge, Mass. (Nathan Z. Dershowitz, Victoria B. Eiger, Dershowitz & Eiger, P.C., New York City, on brief), for defendant-appellant.

Before OAKES, JON O. NEWMAN and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Abraham Srulowitz appeals from a judgment entered in the United States District Court for the Eastern District of New York after a jury trial before John R. Bartels, *Judge*, convicting him of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* (1982) (count one), and of mail fraud, in violation of 18 U.S.C. § 1341 (1982) (count two). Srulowitz was sentenced to six years' imprisonment on count one and five years' probation on count two. On appeal, Srulowitz argues principally that the evidence was insufficient to support his conviction on the mail fraud count and that he is entitled either to dismissal of the RICO count because it is barred by the statute of limitations or to a new trial on the RICO count because the government suppressed potentially exculpatory evidence. For the reasons below, we reverse the judgment of conviction on the mail fraud count and dismiss that count, and we vacate the judgment of conviction on the RICO count and remand for further proceedings as to the RICO count.

## I. BACKGROUND

The government contended that, as one of a "group of individuals associated in fact," 18 U.S.C. § 1961(4), Srulowitz was a member of a RICO enterprise that engaged in arson-for-profit schemes pursuant to which partially occupied residential properties were acquired and insured, their destruction by fire arranged, and insurance payments collected. It contended that Srulowitz's role in the schemes was to take care of purchasing the insurance and to cause the burnings. The evidence focused on four sets of New York City properties, located on Green Avenue in Brooklyn, Rochester Avenue in Brooklyn, Plimpton Avenue in the Bronx, and corner properties at Vyse Avenue and 178th Street (the "Vyse Avenue" properties) in the Bronx. These four groups of properties suffered a total of 13 fires in the 16-month period between May 1976 and August 1977.

Each of the four sets of properties was alleged to have been the subject of a fraudulent scheme involving the mailing of, *inter alia*, false presentations by the coschemers to the insurance carriers. Count one of the indictment described each of the four alleged schemes and, for each, listed two or more mailings alleged to be in violation of the mail fraud statute, 18 U.S.C. § 1341. Each of the four schemes, with its attendant mailings, was alleged to constitute one predicate act for the charge that Srulowitz had conducted the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Count two of the indictment charged that, in furtherance of the fraudulent scheme with respect to the December 23, 1976 burning of the Vyse Avenue properties, Srulowitz had caused a letter to be mailed on September 23, 1978, in violation of §§ 1341 and 2.

### A. *The Pretrial Proceedings*

The indictments against Srulowitz and his alleged coschemers had been returned on May 11, 1983, but remained sealed until July 12, 1983. Some of the defendants moved to dismiss on statute of limitations grounds, contending that the mailings alleged in their indictments occurred more than five years prior to the unsealing, albeit less than five years prior to the return, of the indictments. Srulowitz, though he moved to dismiss the indictment against him on other grounds, did not make a statute of limitations motion. He asserts that he did not so move because the government conceded that he would prevail on a statute of limitations defense but for the September 1978 letter.

Shortly after the indictments were unsealed, the Assistant United States Attorney ("AUSA") handling the case, Max Sayah, furnished certain documents to Srulowitz. Among these, the only documents relating to Vyse Avenue were government files numbered 14 and 15. Thereafter, Srulowitz's attorney requested that Sayah provide copies of or permit the inspection of various insurance company, adjuster, and broker files that were in the government's possession, and "any documents ... or other evidence or information which ... tends to exculpate" Srulowitz. Sayah responded that the government had "furnished copies of all documents the government intends to introduce at trial." Thereafter, Srulowitz's attorney several times requested all additional documents in Sayah's possession relating to insurance coverage on the buildings mentioned in the indictment. No such documents were forthcoming.

### B. The Evidence at Trial

#### 1. The Government's Evidence as to Srulowitz's Involvement in the Arson Schemes

The principal government witness with respect to Srulowitz's involvement in the alleged fraudulent schemes was convicted coschemer Joseph Bald. Bald testified that in January 1976, he formed a partnership with convicted coschemer Abraham Slochowsky and another, and that within the next three years, the partnership caused the burning of some 40 or 45 buildings and collected the insurance money. Bald testified that he first met Srulowitz in the Spring of 1976, and that Srulowitz had boasted, "I burned down buildings for the other people. I could do the same thing for you." Srulowitz first agreed to burn down an unprofitable property on Greene Avenue for the partnership in exchange for 50% of the resulting insurance proceeds. Shortly thereafter, two fires damaged the Greene Avenue property, and Bald submitted the requisite proof-of-loss form to the insurer in order to substantiate a claim for fire insurance proceeds. In January 1977, Bald received insurance proceeds checks totaling $32,500 and paid Srulowitz a total of $12,000 of this amount.

Bald testified that Srulowitz thereafter suggested to him that the partnership purchase the Plimpton Avenue property for $1,500, following which Srulowitz would burn down the building and split the proceeds with Bald. The partnership purchased the building and Bald and Srulowitz obtained insurance on it. At Srulowitz's urging, Jay Hodes of Perry Cohen Associates, a fire adjusters' firm, was retained by the partnership to negotiate with the insurer the amount of damage deemed to have been caused by the fire. Srulowitz arranged for the adjusters to be paid a "wholesale" rate since the partnership anticipated many fires, requiring the submission of many claims. Thereafter, the Plimpton Avenue building suffered fire damage on three occasions between January 16 and January 25, 1977. The partnership received fire insurance payments totaling $67,000.

Bald and his partners found that the buildings they owned on Rochester Avenue were losing money and agreed to sell them to Srulowitz and a partner for $1,000, plus 10% of the fire insurance proceeds to be paid after Srulowitz burned the buildings down. Bald provided Srulowitz with a deed to the property, although there was no contract or closing. Thereafter, in late January and early February 1977, these premises suffered five fires. Srulowitz and his partner never paid Bald his 10% of the fire insurance proceeds, and Bald subsequently bought the building back from Srulowitz for the amount of Bald's unpaid share of the proceeds.

Bald testified that he and his partners purchased the Vyse Avenue properties prior to December 24, 1976, from the 1054 Holding Corporation, a company owned by Philip Holzer and David Gold. Bald and his partners were to pay Holzer and Gold $2,000, plus 25% of the fire insurance proceeds from a planned arson on the buildings. Title to the properties was to remain in the name of 1054 Holding Corporation, but Bald was to make the insurance premi-

um payments. Bald subsequently promised 50% of the insurance proceeds to Srulowitz in exchange for Srulowitz's burning down the buildings. The Vyse Avenue buildings later suffered three fires between December 23, 1976, and January 16, 1977. With respect to the second and third fires, Bald signed the proof-of-loss statements for submission to the insurance carrier. Srulowitz, who did not want to wait for his share of the insurance proceeds, was paid $2,000 by Bald for his entire interest in Vyse Avenue. Bald thereafter collected insurance payments for those two fires totaling $33,000. With respect to the December 23, 1976 fire, Holzer and Gold eventually received all $12,000 of the proceeds following litigation with the insurance carrier, because the 1054 Holding Corporation was indicated as the owner of the premises on the documentation presented to the insurance adjuster, Perry Cohen Associates.

### 2. *The Evidence of Mailing*

Count two of the indictment alleged that on or about September 23, 1978, in furtherance of the scheme with respect to the Vyse Avenue properties, Srulowitz had caused a letter to be mailed to Hodes, the insurance adjuster. The letter, signed by Gold ("Gold Letter"), read as follows:

> Dear Jay,
>
> As of this date my attorney Louis·Shron of 485 Madison Avenue, New York City advises that you have not been cooperative in forwarding all the necesary [*sic*] information on the various fire claims which the insurance company disclaims liability. We cannot commence litigation without the information in your files and I am certain you would not want to be responsible for the lapse of the required time to commence litigation. Please forward the requested documents and information to Mr. Shron at once.
>
> Yours truly,
>
> [/s]
>
> David Gold
>
> c.c. Louis Shron, Esq.
> Philip Holzer

The government offered this letter as having been mailed in connection with the litigation by which Holzer and Gold obtained payment for the Vyse Avenue fire that occurred on December 23, 1976.

As discussed in greater detail in part II.A. below, the Gold Letter was found in the file of Louis Shron, attorney for Gold and Holzer. There was no testimony that Gold or anyone on his behalf mailed this letter. Hodes testified that he did not have any recollection of having received it and did not know whether it had ever been in his files. He was allowed to testify, however, over Srulowitz's objection, that if the letter had been in his files, it would have been received in the mail.

### 3. *Srulowitz's Defense*

In his own behalf, Srulowitz testified that he had engaged in several real estate transactions with Bald but that he had not been involved in any arson or insurance fraud. Srulowitz maintained that he had met Bald in response to Bald's newspaper advertisement seeking investors for projects to rehabilitate buildings. Srulowitz testified that he had invested money with Bald and had been defrauded by him.

He had purchased from Bald interests in properties on Greene Avenue, Rochester Avenue, and Plimpton Avenue. In February 1977, Slochowsky had become irate upon learning that Bald had sold Srulowitz an interest in Greene Avenue, and Srulowitz was then given an interest in the Vyse Avenue properties in exchange for his interest in Greene Avenue. There were no fires on the Vyse Avenue properties after Srulowitz acquired this interest.

Srulowitz soon discovered, however, that Bald did not own the Vyse Avenue properties and thus had sold him an interest in a building that Bald did not own. When he confronted Bald and demanded the return of his money, Bald laughed and told him to sue. Srulowitz never got his money back. He called Bald a thief and ceased to have dealings with him.

## C. *The Posttrial Motions*

The jury found Srulowitz guilty on both the RICO count and the mail fraud count. Thereafter, Srulowitz's attorney, in the course of reviewing the guilty plea of Israel Bilus, a defendant on a related indictment, discovered that the government, while refusing to provide any insurance files to Srulowitz in response to his pretrial requests, had provided to Bilus's counsel copies of insurance files relating to, *inter alia*, the December 23, 1976 fire on the Vyse Avenue properties. Srulowitz's counsel obtained an order from Judge Bartels requiring the government to furnish Srulowitz copies of these files. It transpired that the files, numbered 11 and 12, contained documents, described in greater detail in Part II.B. below, that suggested, among other things, that at the time of the December 23, 1976 fire the Vyse Avenue properties were owned by Holzer and Gold, not by Bald and his partners, and that persons other than Srulowitz had purchased the insurance. Srulowitz moved for a new trial, contending that this evidence was material to his defense at trial principally because (1) it contradicted the government's suggestions that Srulowitz had purchased the insurance on the burned properties, and (2) it contradicted Bald's testimony that the Vyse Avenue properties had been owned by Bald and his partners prior to December 24, 1976, and therefore proved that Bald's testimony that Srulowitz had burned the building for Bald and his partners on December 23, 1976, was false.

The district court denied the motion. It concluded that although "there was little excuse for this omission by the government, the omission was harmless." Memorandum-Decision and Order dated September 18, 1984 ("Decision"), at 3. This evaluation was based in part on the court's belief that the government had never contended that Srulowitz purchased insurance on the Vyse Avenue properties. *Id.* at 6.

Thereafter, Srulowitz made a second motion for a new trial, alleging that further exculpatory evidence had been suppressed by the government. This evidence concerned the availability of an important witness and the possibility that Bald had stated prior to Srulowitz's trial that he intended to frame Srulowitz. After a hearing, the court denied the motion, holding that all of the allegedly suppressed exculpatory evidence either was not exculpatory or had not been suppressed.

Srulowitz was then sentenced as described above, and this appeal followed.

## II. DISCUSSION

On appeal, Srulowitz contends principally that (1) the judgment of conviction for mail fraud, in violation of 18 U.S.C. § 1341, must be reversed since there was insufficient evidence that the Gold Letter, which was the sole basis for the mail fraud charge, had been mailed in furtherance of the alleged scheme to defraud, and (2) he is entitled to a new trial because the government suppressed potentially exculpatory evidence in violation of his right to due process. He also contends that, if indeed the evidence as to the Gold Letter was insufficient, thereby eliminating that letter as a possible predicate for the RICO count, the RICO prosecution was barred by the five-year statute of limitations. We agree that the evidence of mailing was insufficient, and we therefore reverse the judgment of conviction on the mail fraud count and dismiss that count. We also agree that Srulowitz should have been granted a new trial because of the government's suppression of the Vyse Avenue insurance files and that Srulowitz should be allowed to pursue a statute of limitations argument on remand. Accordingly, we vacate the judgment of conviction on the RICO count and remand for further proceedings as to that count.

## A. *Sufficiency of the Evidence of Mail Fraud*

■ "When the government charges a defendant with mail fraud, it must at a minimum clearly and explicitly prove that the mailing occurred." *United States v. Hart*, 693 F.2d 286, 289 (3d Cir.1982). As every element of the government's case

must be proven beyond a reasonable doubt, *e.g.*, *Davis v. United States*, 160 U.S. 469, 487, 16 S.Ct. 353, 358, 40 L.Ed. 499 (1895); *United States v. Gjurashaj*, 706 F.2d 395, 398 (2d Cir.1983), the fact of mailing must be established beyond a mere likelihood or probability, *e.g.*, *United States v. Baker*, 50 F.2d 122, 123–24 (2d Cir.1931); *United States v. Brooks*, 748 F.2d 1199, 1204 (7th Cir.1984). Use of the mail may be proven by evidence that is merely circumstantial, but only "so long as the circumstances proven directly support the inference and exclude all reasonable doubt to the extent of overcoming the presumption of innocence." *Id.* at 1203. The evidence of mailing may not consist merely of speculation. *United States v. Scott*, 730 F.2d 143, 147 (4th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 572, 83 L.Ed.2d 512 (1984); *United States v. Stull*, 521 F.2d 687, 690 (6th Cir. 1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976).

█ In the present case, even taking the evidence, as we must, in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Martinez*, 775 F.2d 31, 35 (2d Cir.1985); *United States v. Esdaille*, 769 F.2d 104, 108–09 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985), we conclude that the evidence presented cannot support an inference of mailing. The Gold Letter was a document typed on Gold's letterhead and signed by Gold. The government presented no direct evidence that the letter had been mailed. Gold did not testify. No witness testified that Gold had mailed the letter or that anyone associated with Gold had mailed the letter. Hodes, the addressee, did testify, but he had no recollection of the letter: He did not recall having received it at all, much less having received it in the mail. His secretary, who customarily opened his mail, was not called to testify.

Nor was there circumstantial evidence that the letter had been mailed. The letter was not found in Hodes's files. Nor did anyone testify to ever having seen the let-

ter in Hodes's files. Rather, the letter, with a copy, was found in the files of Shron, Gold's attorney. It bore no date stamp or other indication that Hodes had received it. It was unaccompanied by an envelope. Shron testified that he had no recollection of the letter and had no knowledge of how the letter or its copy had come to be in his file. He could only surmise that he must have gotten these documents from Hodes or from Gold.

The only testimony indicating that the Gold Letter might have been mailed came from Hodes who was allowed to testify, over objection, that if the letter had been in his files, he would have received it by mail. Hodes did not explain how he arrived at this conjecture; nor did he provide any substantiation for it. On cross-examination, he admitted that he had no way of knowing whether Gold might have had the letter hand-delivered to him instead of sending it by mail.

This "evidence" was entirely too thin to support the mailing element that is essential to a conviction of violation of § 1341. It consisted entirely of a speculative answer to a hypothetical question, and one for which there was no factual foundation. We conclude that no rational juror could have concluded beyond a reasonable doubt that the Gold Letter had been mailed solely on the basis of Hodes's speculation that if the document had been in his files, it would have been received by mail.

Accordingly, we reverse Srulowitz's conviction for mail fraud, and count two is dismissed.

B. *The RICO Conviction and the Withheld Evidence*

█ Srulowitz contends that he should have been granted a new trial on the RICO count principally because the government refused, until after he had been convicted, to give him access to its files numbered 11 and 12 relating to insurance on the Vyse Avenue properties. He argues that the material in those files would have shown, among other things, that it was not he who had purchased insurance on the Vyse Ave-

nue properties and that Bald and his partners had not even owned the Vyse Avenue properties at the time of the first fire that Bald claimed to have asked Srulowitz to set. The district court ruled that Srulowitz was not entitled to a new trial because the evidence in the withheld files was not material. In light of the government's obligation to disclose to the defendant evidence that is material, *see Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and given the standards of materiality established in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *United States v. Bagley,* ── U.S. ──, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), we conclude that Srulowitz was entitled to a new trial.

In *Brady,* the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. The concept of "materiality" was explored in greater detail in *Agurs.* There, the Court noted that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." 427 U.S. at 109–10, 96 S.Ct. at 2400. Rather, undisclosed evidence should be considered material "if [it] creates a reasonable doubt that did not otherwise exist" as to the defendant's guilt. *Id.* at 112, 96 S.Ct. at 2402. This formulation does not mean that the defendant must be able to show that the evidence would "probably lead to an acquittal," which is the standard that must be met for the granting of a new trial on the basis of newly discovered evidence from a source other than the government, *see, e.g., United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980). Rather, "the fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason the defendant

should not have to satisfy the severe burden of demonstrating that [it] probably would have resulted in acquittal. If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice." *Agurs,* 427 U.S. at 111, 96 S.Ct. at 2401 (footnote omitted).

In *Bagley,* the Supreme Court further defined the materiality standard and dispelled a suggestion lurking in *Agurs* that the concept of materiality might differ depending on whether the defendant had made a specific request for the undisclosed evidence, or a general request for exculpatory evidence, or no request at all. Drawing on the notion of materiality developed in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which considered whether a new trial must be granted because evidence had not been introduced on account of the incompetence of counsel, the *Bagley* Court ruled that whether or not any request for exculpatory material had been made, undisclosed "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 105 S.Ct. at 3384 (opinion of Blackmun, J.); *id.* at 3385 (opinion of White, J.). Justice Blackmun's opinion noted that *Strickland* had defined "reasonable probability" as " 'a probability sufficient to undermine confidence in the outcome' " of the case. *Id.* at 3383 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068).

Within this framework, we conclude that the evidence withheld by the government in the present case was material. The district court ruled that the evidence was not material to Srulowitz's trial position that he did not purchase any insurance on the Vyse Avenue properties because the court believed that "the government never contended otherwise." Decision at 6. This view of the government's position, however, is con-

tradicted by the record. During its opening statement, for example, the government portrayed Srulowitz as the person who "took care of purchasing the insurance, contracting with the insurance person to insure the properties." In questioning Slochowsky, Sayah, the government attorney asked, "Did Mr. Srulowitz to your knowledge purchase insurance on [the Vyse Avenue] property?" When Slochowsky responded that Srulowitz "might have" bought the insurance on that property, Sayah pursued the matter by asking why Srulowitz would have purchased the insurance if he was not an owner.

The files withheld by the government also related to a property located on Grant Avenue in the Bronx and owned by the 1054 Holding Corporation, which was damaged by a fire in January 1977. At trial the government introduced the insurance adjuster's file jacket relating to that property, which had Srulowitz's name written on it. Sayah persuaded the court to admit this document by arguing, in part, as follows: "We related Mr. Srulowitz to the 1054 Holding Corporation. What business does he have buying insurance for any building? This document is representing 1054 Holding Corporation and Mr. Srulowitz is buying insurance"; when Srulowitz's attorney challenged Sayah, stating that he thought Sayah knew Srulowitz did not purchase the insurance, Sayah stated, "I think he did." Pursuing this before the jury, Sayah asked Srulowitz on cross-examination if he had insured the Grant Avenue property, and asked whether or not another document refreshed his recollection that he was the principal insured on that property. In fact, however, documents in the files withheld by the government indicated that the insurance on that property had been purchased by Holzer and that 1054 Holding Corporation was the insured.

Plainly, then, the government did contend that Srulowitz purchased insurance, and it made this point to the jury, both in its opening statement and in its questioning of the witnesses. The government argues that, nonetheless, the withheld evidence that Srulowitz did not purchase the insur-

ance should not be deemed material principally because Bald, the government's chief witness, testified that Srulowitz did not buy the insurance on the Vyse Avenue properties. While Bald did so testify, it remains true that Sayah's questions to subsequent witnesses repeatedly suggested to the jury that Srulowitz did in fact buy insurance. Thus, though the proof in the files that the insurance was purchased by someone other than Srulowitz might not have served to impeach Bald on the question of who bought the insurance, it would have served to counter the prosecutor's repeated statements and suggestions that Srulowitz had purchased that insurance.

In addition, the files contained evidence as to the dates on which Bald and Slochowsky purchased insurance on the Vyse Avenue properties. This evidence tended to contradict the testimony of Bald as to the date on which he and his partners purchased those properties, placing the true date of purchase after the date of the first fire on the properties. Since Bald testified that Srulowitz set this fire at Bald's request, evidence that Bald did not own the properties on that date, and hence had no reason for having the properties burned at that time, might well have served to create a reasonable doubt as to the truth of Bald's testimony that Srulowitz was involved in the arson schemes.

In sum, while we think the question is close, we conclude that the evidence in the undisclosed files must be considered material in the constitutional sense, as that concept has been defined by the Supreme Court. Srulowitz may not have shown that the evidence would more likely than not have resulted in his acquittal; but that is not required. The evidence is sufficient to create a "reasonable" probability that the outcome of the trial would have been different had the files been disclosed and to undermine our confidence in the outcome of the trial. Accordingly, Srulowitz's motion for a new trial on the basis of the government's withholding of files 11 and 12 should have been granted.

C. *The Effect of the Reversal of the Mail Fraud Conviction on the RICO Count: The Statute of Limitations Defense*

■ Having concluded that the government's withholding of exculpatory material from Srulowitz prior to trial entitled Srulowitz to a new trial, we do not eliminate the possibility that Srulowitz may, as a result of our reversal of his conviction for mail fraud, be entitled to have the RICO count of the indictment against him dismissed outright on the ground that the statute of limitations bars prosecution of him on that count.

The "racketeering activit[ies]" charged by the government in this case are the acts of mail fraud alleged to violate § 1341 (*see* 18 U.S.C. § 1961(1) (defining "racketeering activity")). In order to prove the "pattern of racketeering activity" prohibited by RICO, *id.* § 1962, the government was required to show that Srulowitz engaged in at least two acts of mail fraud within a ten-year period (at least one of those acts having occurred after the passage of RICO), *id.* § 1961(5). The statute of limitations set forth in 18 U.S.C. § 3282 (1982) provides that

> [e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

RICO does not provide otherwise, and hence, for this prosecution to be timely, at least one of the mail fraud acts must have been committed within five years of the date the indictment was "found." *United States v. Cody,* 722 F.2d 1052, 1056 (2d Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984); *United States v. Walsh,* 700 F.2d 846, 851 (2d Cir.), *cert. denied,* 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983).

The indictment against Srulowitz was returned on May 11, 1983; it was unsealed on July 12, 1983. The indictment lists various mailings, but only two of them are alleged to have occurred after May 11, 1978. One was the September 23, 1978 Gold Letter, as to which there was no evidence of mailing. Hence, that letter cannot serve as a predicate act for conviction of racketeering activity. The other alleged post-May 11, 1978 mailing was a check and letter addressed to Lumley Dennant & Co. alleged to have been mailed on or about June 6, 1978, in connection with the Rochester Avenue scheme.

Reliance on the June 6, 1978 letter to support the timeliness of the RICO count raises two questions, one now ripe for decision and one that will require exploration by the district court on remand. First, Srulowitz contends that the government is estopped from relying on this letter because it conceded in pretrial colloquy before the trial judge that the June 6, 1978 letter was time-barred and that the Gold Letter was the only timely mailing. Srulowitz unsuccessfully raised this argument toward the end of trial, contending that the June 6, 1978 letter should not be submitted to the jury as a possible RICO predicate. The government denied that it had made or intended to make any such concession, and the trial judge agreed that he "never got the impression there was a concession as to June 6, 1978." Our review of the portion of the pretrial transcript relied on by Srulowitz does not persuade us that the district court's rejection of Srulowitz's estoppel argument was erroneous.

The question for decision on remand is what date should be considered the date the indictment was "found" within the meaning of § 3282. If that date is the date on which the indictment was returned, the RICO count as pleaded is not barred by the statute of limitations because the alleged mailing of the June 6, 1978 letter occurred less than five years before the May 11, 1983 return. If, however, the date on which the indictment is "found" is considered to be the date on which the indictment was unsealed, *i.e.,* July 12, 1983, the RICO count must be dismissed because the

alleged June 6, 1978 mailing occurred more than five years prior to that date.

In a similar case we have ruled that the date on which an indictment is "found" within the meaning of § 3282 is the date on which it is returned, rather than the later date of unsealing, when the exercise of a sound discretion has called for the indictment's sealing. *United States v. Southland Corp.*, 760 F.2d 1366, 1379–80 (2d Cir.), *cert. denied*, — U.S. ——, 106 S.Ct. 82, 88 L.Ed.2d 67 (1985). Such an exercise of discretion may be warranted for a number of proper prosecutorial purposes or where the public interest otherwise requires the sealing.

Srulowitz apparently did not argue to the district court that the sealing of the indictment against him was the result of prosecutorial abuse or other improper exercise of discretion; his attorney stated that no statute of limitations argument was being pressed because the Gold Letter was dated within the limitations period. Thus, both at and after trial, the district court noted that the June 6, 1978 letter is timely only if the indictment was properly sealed, but that the court had not needed to reach the issue of the propriety of the sealing with respect to Srulowitz because of the clear timeliness of the Gold Letter. With the elimination of the Gold Letter as a possible predicate act for the RICO count, however, the possibility arises that Srulowitz may wish to pursue a statute of limitations defense related to the propriety of the sealing of the indictment. He is free to do so on remand. We express no view as to the proper resolution of such an issue if raised.

## CONCLUSION

The judgment of conviction on the mail fraud count (count two) is reversed and that count is dismissed; the judgment of conviction on the RICO count (count one) is vacated and the matter is remanded to the district court for further proceedings on count one not inconsistent with this opinion.